UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

BIOSAFE-ONE, INC. and                    :
CHRISTOPHER JORGENSEN,
                                         :

            Plaintiffs,            **OPINION**
                                         :
            - against -           07 Civ. 6764 (DC)
                                         :
ROBERT HAWKS et al.,
                                         :
            Defendants.
                                         :
- - - - - - - - - - - - - - - - - -x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/29/07
```

**APPEARANCES:**   VIKRANT PAWAR, ESQ.
                 ANTHONY WILGER, ESQ.
                 Attorneys for Plaintiffs
                 321 Broadway
                 Suite 200
                 New York, New York  10007

                 LESSLER & LESSLER
                     By:  Arthur Lawrence Lessler, Esq.
                 Attorneys for Defendants
                 540 Old Bridge Turnpike
                 South River, New Jersey  08882

**CHIN, D.J.**

        Plaintiffs Bio-Safe One, Inc. ("Bio-Safe"), an
industrial-strength septic system cleaning products company, and
Christopher Jorgensen ("Jorgensen"), Bio-Safe's owner, allege
that defendants Robert Hawks ("Hawks"), Brad Skierkowski
("Skierkowski"), and their associated companies have engaged in
federal copyright infringement, trade dress infringement,
trademark infringement, trademark dilution, common law breach of
fiduciary duty, and numerous other violations of New York
statutory and common law.

        Jorgensen met Hawks and Skierkowski in 2005 when he
retained them as his mortgage brokers.  The parties have vastly

different accounts of what transpired between the inception of
their relationship and the present.  Plaintiffs allege that Hawks
and Skierkowski misused Jorgensen's confidential information,
which they obtained when they were his mortgage brokers, to
launch their competitor business and website, newtechbio.com,
which they purportedly copied directly from plaintiffs' website,
biosafeone.com.  Defendants deny plaintiffs' allegations, and
claim that the launch of their business and accompanying website
do not violate federal or state law.

     Specifically, plaintiffs allege that defendants misused
Jorgensen's information to contact and steal plaintiffs'
suppliers, customers, advertisers, and vendors, and to disparage
and impersonate plaintiffs, damaging plaintiffs' goodwill and
resulting in a decline in customers and sales volumes.  Among
plaintiffs' allegations are that defendants reviewed Jorgensen's
bank statements to locate his Federal Express account number,
which they then used to illegally acquire the contact information
for plaintiffs' secret vendor, Novozymes, from Federal Express.
Additionally, plaintiffs claim that Hawks received a list of IP
addresses for individuals visiting biosafeone.com under the false
pretense that he would help Jorgensen stop a "click fraud"
problem, and that Hawks instead used this list to identify
plaintiffs' customers, contact them to solicit business, and pose
as a Bio-Safe representative.

     Plaintiffs further allege that defendants illegally
appropriated large amounts of material from biosafeone.com for

- 2 -

use on newtechbio.com, including text, photographs, pictures, drawings, graphics, and other material.  Plaintiffs submitted two Digital Millennium Copyright Act ("DMCA") notices to defendants' web hosting companies, resulting in the shut-down of defendants' website, forcing them to host it overseas at a higher cost. Defendants argue that filing these notices violated the DMCA's prohibition against misrepresentation.

Plaintiffs now move under Federal Rule of Civil Procedure 65(a) for a preliminary injunction shutting down defendants' business and website; barring defendants from using plaintiffs' copyrighted materials, trademarks, and trade dress; barring defendants from further breaching their fiduciary duties; and prohibiting defendants from contacting plaintiffs' customers, suppliers, vendors, and advertisers.  Defendants cross-move for a preliminary injunction prohibiting plaintiffs from further interfering with their website and an order to reactivate their website.  The Court conducted an evidentiary hearing on October 2, 2007.

For the reasons set forth below, plaintiffs' motion is denied and defendants' motion is granted.  Pursuant to Federal Rule of Civil Procedure 52(a), my findings of fact and conclusions of law follow.

## BACKGROUND

### A.  Findings of Fact

#### 1.  Bio-Safe

Since 2001, Bio-Safe has been selling industrial-strength septic cleaning products through its website, biosafeone.com.  (Pl. Mem. at 2).  This website is Bio-Safe's primary means of marketing its products to consumers.  (Id.).  Bio-Safe possesses a copyright registration for its website.  (Compl. Ex. A).[1]

#### 2.  Jorgensen's Mortgage Application

Jorgensen met Hawks and Skierkowski in 2005 when he was in the market for a "jumbo" mortgage and he identified them as mortgage brokers through an internet search.  (Compl. ¶¶ 33-34).  Jorgensen retained them as his brokers, and the parties entered into a contract that provided that Jorgensen's information would only be used for the processing of his mortgage application.  (Pl. Ex. 3).  Hawks and Skierkowsky finalized one mortgage for Jorgensen during the course of their business relationship, which ended in late 2005.  (Hawks Decl. ¶ 7).

At the outset of their relationship, Hawks and Skierkowski required that Jorgensen provide information regarding

---

[1]  I have cited to the verified complaint for certain background facts.  See Parke, Davis & Co. v. Amalgamated Health & Drug Plan, Inc., 205 F. Supp. 597, 601 (S.D.N.Y. 1962) ("Where the pleadings are properly verified, they may serve the office both of pleadings and evidence on an application for a temporary injunction.").

his personal and business finances to apply for his mortgage.
(Hawks Decl. ¶ 5).  Defendants requested and received Jorgensen's
mortgage application, bank statements, and credit reports.  (Tr.
at 61-63; Hawks Decl. at 2).[2]  Defendants did not receive
customer or vendor lists for Bio-Safe.  (Hawks Decl. at 2).
Jorgensen was very "secretive" about his business and did not
divulge -- nor did defendants ask him to divulge -- any
substantive details regarding Bio-Safe.  (Tr. at 64).

### 3.  Defendants Launch Newtechbio

In April 2007, Hawks and Skierkowski launched an
industrial-strength septic cleaning products company, Newtechbio,
with a company website, newtechbio.com.  (Hawks Decl. at 3).
Newtechbio competes with Bio-Safe, offering similar products at
similar prices and volumes.  (Compl. ¶ 51).  Defendants have no
prior experience in the septic or chemicals industry.  (Id. ¶
52).

Defendants did not use Jorgensen's bank statements,
credit card statements, or other financial or business records to
contact and steal Bio-Safe's customers, suppliers, advertisers,
or vendors.  (See Compl. ¶¶ 53-57, 116-21; Tr. at 10-12).
Defendants similarly did not disparage or impersonate
plaintiffs.[3]

---

[2]  "Tr." refers to the transcript of the October 2, 2007
hearing.

[3]  Jorgensen's allegations are not credible, as they are
based solely on his own hunches.  Plaintiffs concede that it is
mere speculation that defendants stole customer lists using

Prior to the filing of this lawsuit, defendants copied portions of their website from plaintiffs' website.  (<u>Id.</u> at 66-67).  While planning to launch newtechbio.com, Hawks reviewed competitors' websites, compiling a master document of text from those sites.  (<u>Id.</u>).  Hawks copied portions of the master document that contained material from biosafeone.com to newtechbio.com.  (<u>Id.</u>).[4]  Defendants copied no graphics or photographs from biosafeone.com, and these elements appear dissimilar to the plain eye.

Once this action was filed, Hawks immediately removed the text belonging to biosafeone.com from his website.  (<u>Id.</u> at 67).  Hawks changed the website at least a few days before August 21, 2007.  (Hawks Decl. ¶ 8).  There are certain words, phrases, and navigational elements -- such as the term "shock" and a "frequently asked questions" section -- that were not removed from defendants' website.  The term "shock" is commonly used in the septic industry and appears on many industry websites.  (<u>Id.</u>

---

Jorgensen's bank statements.  (Tr. at 17-18).  Bank statements plaintiffs provided to the Court do include entries of payments made to Novozymes, but the mere existence of such entries is insufficient to support the contention that defendants used them to identify and solicit Novozymes.  (<u>See</u> <u>id.</u> at 12).  I find Hawks's testimony that he selected Novozymes as his supplier using an internet search credible.  (<u>Id.</u> at 60).  There is similarly no evidence that Hawks used the list of IP addresses provided by Jorgensen to identify plaintiffs' customers, contact them to solicit business, and pose as a Bio-Safe representative. (<u>See</u> Tr. at 49-51).  I find Hawks's testimony that he used the IP addresses from Jorgensen only to help him alleviate his click fraud problem credible.  (<u>Id.</u> at 82-83).

[4]   Hawks contends that he did so inadvertently.

¶¶ 17-18).  Frequently asked questions sections appear on
numerous websites.  (Id. ¶ 62).

### 4. **Web Traffic**

Defendants did not intentionally divert internet
traffic intended for plaintiffs' website to their own by
purchasing the Bio-Safe mark as a keyword with search engines.[5]
Furthermore, defendants advised Yahoo.com to exclude the Bio-Safe
name from future searches for their company, and Yahoo.com has
provided a statement that defendants did not cause searches using
Bio-Safe's name to direct results for newtechbio.com.  (Def. Mem.
Ex. L).

### 5. **DMCA Notices**

On August 23, 2007, defendants' web hosting company
shut down defendants' website upon receiving a DMCA notice from
plaintiffs, pursuant to 18 U.S.C. § 512(c)(3), dated August 21,
2007, stating that defendants' website infringed on plaintiffs'
copyright.  (Pawar Cert. Ex. 12).  Shortly thereafter defendants
moved their website to a new domain with a new name,
cloggeddrainfield.com.  Plaintiffs submitted another DMCA notice
to defendants' new hosting company, and the website was again
shut down on August 27, 2007.  (Id.).  These notices were filed
after defendants realized that portions of newtechbio.com had
been copied from biosafeone.com and removed the copied portions
from their website.  (Tr. at 67).  Defendants must now host their

---

[5]  Plaintiffs' claim that defendants did so is unsupported
by any evidence.  (See Compl. ¶¶ 98-108).

website outside the country at a significantly increased cost.
(Hawks Decl. ¶ 51).

## B. **Prior Proceedings**

This action was commenced by plaintiffs on July 26,
2007.  Plaintiffs moved for a preliminary injunction on August
13, 2007.  On September 12, 2007, defendants filed a cross motion
for preliminary injunction and order to reactivate their website.
The Court conducted a hearing and heard argument on October 2,
2007.  Three witnesses testified.  I reserved decision.

## DISCUSSION AND CONCLUSIONS OF LAW

## A. **Applicable Law for Preliminary Injunctions**

A preliminary injunction is "an extraordinary and
drastic remedy that will not be granted absent a clear showing
that the [moving party] has met its burden of proof."
Christie-Spencer Corp. v. Hausman Realty Co., 118 F. Supp. 2d
408, 417 (S.D.N.Y. 2000).  To prevail on a motion for a
preliminary injunction, the moving party must demonstrate (1) a
threat of irreparable injury and (2) either (a) a probability of
success on the merits or (b) sufficiently serious questions going
to the merits to make them fair grounds for litigation, as well
as a balance of hardships tipping decidedly in the moving party's
favor.  See, e.g., Time Warner Cable v. Bloomberg L.P., 118 F.3d
917, 923 (2d Cir. 1997).  Irreparable injury exists where, but
for the granting of the preliminary injunction, it would be
difficult or impossible to return the parties to the positions

- 8 -

they previously occupied.  See Brenntag Int'l Chems., Inc. v. Bank of India, 175 F.3d 245, 249 (2d Cir. 1999).

A trial court has discretion to fashion a preliminary injunction that will preserve the status quo pending a trial on the merits.  Arthur Guinness & Sons, PLC v. Sterling Pub. Co., 732 F.2d 1095, 1099 (2d Cir. 1984); see also Grand Union Co. v. Cord Meyer Dev. Co., 761 F.2d 141, 147 (2d Cir. 1985).  The decision to grant or deny preliminary injunctive relief rests within the sound discretion of the trial court, and will not be disturbed on appeal absent a showing of abuse of discretion.  See Arthur Guinness & Sons, 732 F.2d at 1095; see also Wallikas v. Walker, 78 F. Supp. 2d 36, 39 (S.D.N.Y. 1999) (citing JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 79 (2d Cir. 1990)).

## B.   Plaintiffs' Motion for Preliminary Injunction

I now consider whether plaintiffs have met the standard for issuance of a preliminary injunction.

### 1.   Irreparable Harm

Irreparable harm is often presumed in copyright, trademark, and trade dress infringement cases.  Richard Feiner and Co. v. Turner Ent. Co., MGM/UA, 98 F.3d 33, 34 (2d Cir. 1996) ("When a plaintiff establishes a prima facie case of copyright infringement, irreparable harm is presumed."); Tough Traveler, Ltd. v. Outbound Products, 60 F.3d 964, 967-68 (2d Cir. 1995) (same in trademark and trade dress context).  The theory underlying this presumption is that it is difficult to remedy

confusion in the marketplace by an award of damages.  Id.  The
Court assumes plaintiffs have shown irreparable harm.

### 2.    **The Merits**

Plaintiffs have not demonstrated a probability of
success on the merits of any of their claims.  Their claims are
considered in turn.

#### a.    **Copyright Infringement**

##### i.    **Applicable Law**

To succeed on a copyright infringement claim,
plaintiffs must establish "(1) ownership of a valid copyright,
and (2) copying of constituent elements of the work that are
original."  Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S.
340, 361 (1991); see Hasbro Bradley, Inc. v. Sparkle Toys, Inc.,
780 F.2d 189, 192 (2d Cir. 1985).  The issuance of a certificate
of registration for a copyright is prima facie evidence of the
validity of the copyright.  See id.

To satisfy the second element, the copyright owner must
demonstrate "'(1) the defendant has actually copied the
plaintiff's work; and (2) the copying is illegal because a
substantial similarity exists between the defendant's work and
the protectible elements of plaintiff's.'"  Yurman Design, Inc.
v. PAJ, Inc., 262 F.3d 101, 110 (2d Cir. 2001) (quoting Hamil
Am., Inc. v. GFI, 193 F.3d 92, 99 (2d Cir. 1999)).  Actual
copying may be established by either direct evidence of copying
or circumstantial proof of copying, consisting of evidence that

the alleged infringer had access to the protected work and "that there are similarities between the two works that are probative of copying." Jorgensen v. Epic/Sony Records, 351 F.3d 46, 51 (2d Cir. 2003) (internal quotations omitted). The standard test for substantial similarity is whether an "'ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the] aesthetic appeal as the same.'" Hamil Am., 193 F.3d at 100 (quoting Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 274 F.2d 487, 489 (2d Cir. 1960) (L. Hand, J.)). Such a comparison "must be made on a case-by-case basis, as there are no bright-line rules for what constitutes substantial similarity." Sandoval v. New Line Cinema Corp., 147 F.3d 215, 217 (2d Cir. 1998). A court examines the works' total concept and feel. Boisson v. Banian, Ltd., 273 F.3d 262, 272 (2d Cir. 2001).

Critical to the issue of improper appropriation is whether the copied elements of the work are original and nontrivial. See Feist Publ'ns, 499 U.S. at 345 ("The sine qua non of copyright is originality."). Not all copying of copyrighted material is an infringement of copyright, as there are some elements of a copyrighted work that are not protected, even against intentional copying. Attia v. Society of N.Y. Hosp., 201 F.3d 50, 54 (2d Cir. 1999). For example, a central tenet of copyright law is that only a copyright owner's particular expression of his or her idea is protected, not the idea itself. 17 U.S.C. § 102(b) ("In no case does copyright

protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."); Rogers v. Koons, 960 F.2d 301, 308 (2d Cir. 1992) ("What is protected is the original or unique way that an author expresses those ideas, concepts, principles or processes."). Copyright protection extends to choices of "selection and arrangement, so long as they are made independently by the compiler and entail a minimal degree of creativity." Feist Publ'ns, 499 U.S. at 348.

Notwithstanding proof that copying occurred, copying that is so trivial as to not meet the substantial similarity test will be considered de minimis and not actionable. Sandoval, 147 F.3d at 217. The de minimis doctrine is "an important aspect of the law of copyright," as "[t]rivial copying is a significant part of modern life," and "[m]ost honest citizens in the modern world frequently engage, without hesitation, in trivial copying that, but for the de minimis doctrine, would technically constitute a violation of law." On Davis v. The Gap, Inc., 246 F.3d 152 (2d Cir. 2001).

### ii. **Application**

Bio-Safe possesses a copyright registration for its website, entitling it to the presumption that its copyright is valid. Plaintiffs therefore meet the first element of their claim. As to the second element -- "copying of constituent elements of the work that are original" -- plaintiffs have

demonstrated actual copying, but have failed to demonstrate a substantial similarity exists between Newtechbio's website and the protectible elements of Bio-Safe's website.

Moreover, although defendants admit to copying, albeit inadvertently, textual elements of plaintiffs' website, since the complaint was filed defendants have removed the copied portions from their website.

With respect to the substantial similarity prong, plaintiffs fail to establish that defendants' copying is illegal. Applying the "ordinary observer test," with the Court assessing the two works' total concept and feel, there is no substantial similarity. A side-by-side comparison simply does not prompt an ordinary observer to regard the aesthetic appeal of the websites as the same. Rather, it is difficult to detect any similarities. The arrangement, photographs, and graphics on the websites are decidedly dissimilar. The textual elements that remain similar on the websites, including minor phrasing and terminology, are so far spaced throughout that they are not noticeable.

Furthermore, this remaining similar text does not contain protectible elements. Terms such as "shock," which plaintiffs argue are protectible (see Tr. at 36-38) are merely technical industry concepts that are widely used, as evidenced by their prevalence on industry websites, and not original or unique expressions of those concepts. Even if these phrases and terminology were entitled to legal protection, the copying is minimal and trivial, rendering it de minimis and not actionable.

Accordingly, plaintiffs have failed to demonstrate they will likely prevail on their copyright claim.

### b.   Trademark Infringement

#### i.   Applicable Law

To prevail on a trademark infringement claim, a plaintiff must prove (1) his mark is entitled to protection, and (2) defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods. See Virgin Enterprises Ltd. v. Nawab, 335 F.3d 141, 146 (2d Cir. 2003); Gruner + Jahr USA Publ'g v. Meredith Corp., 991 F.2d 1072, 1074 (2d Cir. 1993). The second element, likelihood of confusion, is assessed using the Polaroid Corp. v. Polarad Elecs. Corp. test.  287 F.2d 492, 495 (2d Cir. 1961). This test requires examining

> the strength of [the owner's] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.

Id. This analysis is "not a mechanical measurement," and "a court should focus on the ultimate question of whether consumers are likely to be confused." Nora Beverages, Inc. v. Perrier Group of Am., Inc., 269 F.3d 114, 119 (2d Cir. 2001) (internal citations and quotations omitted).

## ii.  **Application**

Plaintiffs fail to demonstrate that "a significant
number of consumers are likely to be confused."  I examine the
Polaroid factors in turn.

The plaintiffs demonstrate the strength of their mark.
The strength of a mark is "its tendency to identify the goods
. . . sold under the mark as emanating from a particular,
although possibly anonymous, source."  Sports Auth., Inc. v.
Prime Hospitality Corp., 89 F.3d 955, 960-61 (2d Cir. 1996)
(internal quotations and citation omitted).  The strength of a
mark depends on its inherent distinctiveness and its
distinctiveness in the marketplace.  Brockmeyer v. Hearst Corp.,
248 F. Supp. 2d 281, 294 (S.D.N.Y. 2003).  The Bio-Safe logo and
overall look and feel of the website identify the products sold
as emanating from Bio-Safe.

As to similarity, a court considers "1) whether the
similarity between the two marks is likely to cause confusion and
2) what effect the similarity has upon prospective purchasers."
Sports Auth., 89 F.3d at 962.  The two marks are not similar
enough in appearance to confuse consumers.  As discussed above, a
side-by-side comparison of the websites does not reveal strong
similarities.  The shapes of the logos, company names, color
placement, navigation, organizational elements, and layout of the
websites would not be confused by potential purchasers.  This
factor weighs against plaintiffs.

The "proximity of the products" factor examines "whether, due to the commercial proximity of the competitive products, consumers may be confused as to their source." Hasbro, Inc. v. Lanard Toys, Ltd., 858 F.2d 70, 77 (2d Cir. 1988); Clinique Labs. Inc. v. Dep Corp., 945 F. Supp. 547, 553 (S.D.N.Y. 1996). In assessing commercial proximity, courts should compare all relevant aspects of the products, including style, price, intended uses, target clientele, and channels of distribution. Brockmeyer, 248 F. Supp. 2d at 296. Plaintiffs have demonstrated that they and defendants are trying to reach the same market. Their products target the same clients, are for the same uses, are similar in price, and are both distributed primarily through the internet. This factor weighs in plaintiffs' favor.

The fourth factor considers whether the plaintiffs will "bridge the gap" and enter defendants' business. Sports Auth., 89 F.3d at 963. Here, the parties compete in the same market. Therefore, the question of whether plaintiffs will "bridge the gap" is irrelevant. Paddington Corp. v. Attiki Imps. & Distribs., 996 F.2d 577, 586 (2d Cir. 2003) (likelihood of bridging the gap irrelevant where parties already compete in the same market).

The fifth factor, actual confusion, deals with "consumer confusion that enables a seller to pass off his goods as the goods of another." Sports Auth., 89 F.3d at 963 (internal quotations and citation omitted). "It is self-evident that the

- 16 -

existence of actual consumer confusion indicates a likelihood of consumer confusion," and therefore the Second Circuit has "deemed evidence of actual confusion particularly relevant." <u>Virgin Enters. Ltd. v. Nawab</u>, 335 F.3d 141 (2d Cir. 2003) (citations omitted). Plaintiffs' conclusory statements that consumers are confused do not prove actual confusion, and plaintiffs have cited no credible instances of actual confusion.[6]  This factor weighs in defendants' favor.

The sixth factor examines defendants' good faith in adopting the mark, asking "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." <u>Lang v. Retirement Living Pub. Co.</u>, 949 F.2d 576, 583 (2d Cir. 1991) (citation omitted). As discussed above, the Court finds that defendants did not act in bad faith. Plaintiffs' allegations that defendants acted in bad faith are conclusory and unsupported by evidence. This factor weighs in defendants' favor.

The seventh factor, quality of defendants' products, asks "whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." <u>Arrow Fastener Co. v. Stanley Works</u>, 59 F.3d

---

[6]  Jorgensen's Declaration states that three emails from his customers indicating their confusion are included in plaintiffs' moving papers. (Jorgensen Decl. ¶ 17). It appears that only one of these emails is actually included -- an email sent from John Howard to sales@biosafeone.com on September 20, 2007. Plaintiffs do not provide an affidavit from John Howard.

384, 398 (2d Cir. 1995).   Plaintiffs concede that they are
unaware of the quality of defendants' products (see Pl. Mem. at
19) and present no evidence that defendants' products are
inferior.   The fact that defendants have less experience than
plaintiffs is not alone sufficient to establish this element.
This factor weighs in favor of defendants.

        In evaluating the eighth factor, sophistication of the
buyers, a court considers "the general impression of the ordinary
purchaser, buying under the normally prevalent conditions of the
market and giving the attention such purchasers usually give in
buying that class of goods."   Star Indus., Inc. v. Bacardi & Co.
Ltd., 412 F.3d 373, 390 (2d Cir. 2005).   The parties both market
to ordinary consumers who likely know little about industrial-
strength septic cleaning products.   Therefore, the sophistication
of the buyers weighs in favor of a likelihood of confusion.

        Overall, there is little likelihood of consumer
confusion.   The Polaroid factors weighing in favor of defendants,
particularly the similarity factor, are stronger than those in
favor of plaintiffs.   Therefore, even assuming plaintiffs' mark
is entitled to protection, they have failed to demonstrate they
will likely prevail on their trademark infringement claim.

        c.   **Trade Dress Infringement**

             i.   **Applicable Law**

        Trade dress "encompasses the design and appearance of
the product together with all the elements making up the overall
image that serves to identify the product presented to the

consumer." Nora Beverages, Inc. v. Perrier Group of Am., Inc.,
164 F.3d 736, 743 (2d Cir. 1998) (internal citations and
quotations omitted).  The statutory protection afforded to
trademarks extends to trade dress.  See Two Pesos, Inc. v. Taco
Cabana, Inc., 505 U.S. 763, 773 (1992).  To succeed on the merits
of a trade dress infringement claim, a plaintiff must demonstrate
"(1) its trade dress is distinctive and (2) there exists a
likelihood of confusion between its product and the alleged
infringer's product."  Forschner Group, Inc. v. Arrow Trading
Co., 124 F.3d 402, 407 (2d Cir. 1997).  For trade dress to be
deemed "inherently distinctive," it must serve as an "indication
of origin," so that a consumer would "readily rely on it to
distinguish it" from competitors.  Id. at 407-08.  The
"confusion" prong is assessed using the Polaroid test.

### ii.  **Application**

Plaintiffs are not likely to establish their trade
dress infringement claim.  Bio-Safe's trade dress is distinctive,
because its website, brochures, and packaging do indicate that
the products sold originate from Bio-Safe. As discussed above,
however, plaintiffs have failed to establish a likelihood of
confusion under the Polaroid test.  The two sets of trade dress
simply are not likely to cause consumer confusion as to their
origin.

### d.    **Trademark Dilution**

#### i.    **Applicable Law**

The Federal Trademark Dilution Act "entitles the owner
of a famous, distinctive mark to an injunction against the user
of a mark that is 'likely to cause dilution' of the famous mark."
Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 477 F.3d 765,
766 (2d Cir. 2007) (quoting 15 U.S.C. § 1125(c)(1)).  "[A] mark
is famous if it is widely recognized by the general consuming
public of the United States as a designation of source of the
goods or services of the mark's owner."  15 U.S.C. § 1125(c).
The statute outlines factors to consider in assessing whether a
mark has the requisite degree of recognition, including:

> (i) The duration, extent, and geographic
> reach of advertising and publicity of the
> mark, whether advertised or publicized by the
> owner or third parties.
> (ii) The amount, volume, and geographic
> extent of sales of goods or services offered
> under the mark.
> (iii) The extent of actual recognition of the
> mark.

Id.  The statute recognizes two types of dilution:   (1)
tarnishment, which is the disparagement of the mark's reputation,
and (2) blurring, which is the diminished ability of the mark to
serve as a unique identifier of the plaintiffs' goods and
services.  Id.

#### ii.   **Application**

Plaintiffs have failed to demonstrate that their
trademarks are famous within the meaning of the statute.

Plaintiffs' mark has been in use for only five years.
Furthermore, there is no evidence presented that the reach of the
advertising or publicity of Bio-Safe is broad, nor has evidence
been presented that the amount, volume, and extent of sales under
the mark is at a level that demonstrates the necessary degree of
recognition by the general U.S. public. Plaintiffs' conclusory
statements that Bio-Safe is well-known and highly regarded for
having high quality products in the industry are insufficient.
Because plaintiffs have failed to demonstrate their mark is
famous, I need not reach the dilution prong.

### e.   Breach of Fiduciary Duty, Unfair Competition, and Misappropriation of Corporate Opportunities

#### i.   Applicable Law

"In New York, it is well settled that a real estate
broker is a fiduciary with a duty of loyalty and an obligation to
act in the best interests of the principal." Dubbs v. Stribling
& Assocs., 752 N.E.2d 850, 852 (N.Y. 2001). Breach is
demonstrated by a failure to meet this duty. Plaintiffs bringing
misappropriation and unfair competition claims must establish
"some wrongful appropriation or use of the plaintiffs'
intellectual property." Dow Jones & Co., Inc. v. Int'l Sec.
Exch., Inc., 451 F.3d 295, 302 (2d Cir. 2006); see Roy Export Co.
Establishment v. Columbia Broad. Sys., 672 F.2d 1095, 1105 (2d
Cir. 1982) ("An unfair competition claim involving
misappropriation usually concerns the taking and use of the

- 21 -

plaintiff's property to compete against the plaintiff's own use
of the same property.")

## ii. **Application**

Plaintiffs have presented insufficient evidence that
defendants misappropriated Jorgensen's confidential information
or failed to act in his best interest during the course of their
broker/principal relationship.  As previously noted, Jorgensen's
testimony that defendants used his bank statements, credit card
statements, and other financial and business records to contact
and steal customers, suppliers, advertisers, or vendors is not
credible.  Similarly, plaintiffs produce no convincing evidence
that defendants disparaged or impersonated plaintiffs.  The mere
fact that defendants entered into the same business as Jorgensen
eighteen months after the end of their broker/principal
relationship is not evidence of wrongdoing.  Accordingly,
plaintiffs are not likely to prevail on their claims of breach of
fiduciary duty, unfair competition, or misappropriation of
corporate opportunity.

## 3. **The Balance of Hardships**

Plaintiffs have failed to demonstrate a likelihood of
success on the merits for any of their claims.  Accordingly, they
have not met the first prong of the second element of the
preliminary injunction standard.  Even if the Court were to
conclude that plaintiffs had demonstrated "sufficiently serious
questions going to the merits to make them fair grounds for
litigation," plaintiffs have also failed to demonstrate that the

balance of hardships tips in their favor.  Defendants have drastically altered their website since plaintiffs filed this action.  No potentially offending material remains on their website.  Shutting down newtechbio.com (and effectively closing defendants' business) would surely harm defendants to a greater extent than plaintiffs would be harmed absent the relief sought.

## C.   Defendants' Motion for Preliminary Injunction and Order to Reactivate Website

I now consider whether defendants have met the standard for issuance of a preliminary injunction enjoining plaintiffs from further interfering with their website.  Defendants complain that after removing the portions of newtechbio.com that were inadvertently copied from biosafeone.com, plaintiffs caused their hosting company, Add2Net, Inc. d/b/a/ Lunarpages ("Add2Net"), to shut down defendants' website by submitting a DMCA notice that falsely stated that defendants' website was infringing. Plaintiffs also had defendants' second website, cloggeddrainfield.com, which was hosted by a different company, Godaddy.com, shut down with a DMCA notice.  Defendants argue that plaintiffs knowingly misrepresented that defendants were infringing to both web hosting companies in violation of 17 U.S.C. 512(f), forcing defendants to host their website outside the country at a higher cost.

Defendants now ask the Court to preliminarily enjoin plaintiffs from interfering with the operation of defendants' website.  Additionally, defendants request that the Court issue

- 23 -

an order directing Add2Net to reactivate newtechbio.com.[7]  I
conclude defendants have met the requirements for issuance of a
preliminary injunction and thus their motion is granted.  Because
defendants' website is not infringing, I will issue an order
directing defendants' web hosting company to reactive their
website.

## 1.    **Irreparable Harm**

Defendants have demonstrated irreparable harm.
Irreparable injury exists where, but for the granting of the
preliminary injunction, it would be difficult or impossible to
return the parties to the positions they previously occupied.
See Brenntag Int'l Chems., Inc., 175 F.3d at 249.  A preliminary
injunction is necessary to return defendants to the position they
occupied before plaintiffs filed the DMCA notices with their web
hosting companies, as plaintiffs have demonstrated twice that
they will submit notices even when defendants' website is not
infringing.  Defendants' website, while operational, is only
hosted at a higher cost.  Restoring their website with Add2Net
will return them to the position they previously held and
enjoining plaintiffs from further interfering will serve to
prevent any further harm from occurring.

---

[7]  Defendants do not request that the Court order
Godaddy.com to reactivate cloggeddrainfield.com.

## 2.    The Merits

Defendants argue that plaintiffs' actions violate the misrepresentation provision of the DMCA.  I now discuss whether defendants would likely prevail on their claim.

### a.    Applicable Law

The DMCA provides in relevant part:

> Any person who knowingly materially
> misrepresents . . . that material or activity
> is infringing . . . shall be liable for any
> damages, including costs and attorneys' fees,
> incurred by the alleged infringer, by any
> copyright owner or copyright owner's
> authorized licensee, or by a service
> provider, who is injured by such
> misrepresentation, as the result of the
> service provider relying upon such
> misrepresentation in removing or disabling
> access to the material or activity claimed to
> be infringing, or in replacing the removed
> material or ceasing to disable access to it.

17 U.S.C. § 512(f).  The case law in this circuit discussing this provision is sparse.  Defendants have not cited any cases to support their argument that plaintiffs violated the statute.

### b.    Application

Defendants have failed to present sufficient evidence that plaintiffs violated § 512(f).  The definition of the term "knowingly materially misrepresent" is key to analyzing defendants' claim.  Defendants have not submitted any evidence that plaintiffs were aware or understood that they were misrepresenting the fact that defendants' website was infringing when they filed their notices.  Plaintiffs have submitted ample evidence in their moving papers and by Jorgensen's testimony that

they believed, and continue to believe, that defendants' website violated their copyright when they filed the notices.  (See e.g., Wilkens Decl. Exs. 1-9).  Moreover, the statutory language specifically provides for the remedy of damages and makes no mention of injunctive relief.

### 3.    The Balance of Hardships

While defendants have not demonstrated their likely success on the merits, they have demonstrated sufficiently serious questions going to the merits to make them fair grounds for litigation and a balance of hardships tipping in their favor. To succeed on their claim, defendants need only prove plaintiffs knew defendants were not infringing when they submitted the DMCA notices.  Defendants have not yet had the opportunity to fully develop this theory.  See Clemente Global Growth Fund, Inc. v. Pickens, 705 F. Supp. 958, 971 (S.D.N.Y. 1989) (noting that limited discovery counsels in favor of a finding of "sufficiently serious questions going to the merits" when a showing of balance of hardships tipping in party's favor is made).  Portions of Jorgensen's testimony lacked credibility, and a fair issue exists as to whether his statements that newtechbio.com infringed when he sent the DMCA notices were intentionally and knowingly false. Furthermore, while it is true that if defendants' website is ordered restored their harm will be greatly reduced, if plaintiffs continue to send DMCA notices defendants will be burdened, financially and otherwise, with arranging for alternative companies to host their website outside the country.

A preliminary injunction barring plaintiffs from sending additional DMCA notices, absent court approval, however, would impose little or no burden on plaintiffs.

## CONCLUSION

For the reasons set forth, plaintiffs' motion for a preliminary injunction is denied. Defendants' motion for a preliminary injunction is granted. As defendants's website does not contain any infringing material, Add2Net is ordered to reactivate defendants' website, newtechbio.com. Defendants shall submit a proposed order on notice.

SO ORDERED.

Dated:   New York, New York
         November 29, 2007

DENNY CHIN
United States District Judge